# EXHIBIT A

## EXCLUSIVE DISTRIBUTION AGREEMENT

This Agreement is entered into as of this 28nd day of September, 2015, by and between HIGH DREAM MACHINERY LLC, a Delaware limited liability company with its principal offices at 5706 Mira Sierra El Paso, Texas 79912 ("**High Dream Texas**"), and collectively with High Dream Texas and any affiliates, the ("**Ducorsky Group**") and C.P. PACKAGING INC. D/B/A OHLSON PACKAGING INC., a Massachusetts corporation with its principal offices at 490 Constitution Drive, Taunton, MA 02780, and any affiliates (hereinafter "**Ohlson Packaging**" or the "**Distributor**"), and with respect to Section 2.3 (Non-Circumvention and Non-Competition) and Section 8 (Term and Termination) only: BRAD DUCORSKY, the principal owner of High Dream Texas with a mailing address of 5706 Mira Sierra El Paso, Texas 79912 ("**Ducorsky**") and JOHN OHLSON, JR., principal owner of Ohlson Packaging with a mailing address of 490 Constitution Drive, Taunton, MA 02780 ("**Ohlson**").

## STATEMENT OF PURPOSE AND MUTUAL CONSIDERATION

The purpose of this Agreement is to define the terms and conditions of the distributorship relationship between the Distributor and the Ducorsky Group.

High Dream Texas has entered into an Exclusive Distributorship Agreement ("**HD China Agreement**") dated December 13, 2013 with High Dream Intellectualized Machinery Manufacturing Co., Ltd., of GuangDong, China ("**HD China**") pursuant to which High Dream Texas has the exclusive right to purchase, sell and market multi-head weighers manufactured, assembled or offered for sale by HD China in the United States. A copy of the HD China Agreement is attached hereto as **Exhibit A**.

The Ducorsky Group currently imports or may import other packaging or related machinery from suppliers.

The Distributor has facilities, personnel and resources capable of providing effective distribution, sales and service of the Products (defined in item 1), machinery and supplies imported by High Dream Texas, and the Distributor has substantial expertise in the distribution business, and desires to distribute, sell and service the Products, machinery and supplies of High Dream Texas in accordance with this Agreement.

Accordingly, in consideration of the above, the promises stated below, and other good and valuable consideration, the receipt and adequacy of which is hereby acknowledged, the Distributor, High Dream Texas (and with respect to Section 2.3 (Non-Circumvention and Non-Competition) and Section 8 (Term and Termination) only, Ducorsky and Ohlson intending to be legally bound, agree as follows:

## TERMS AND CONDITIONS

1. **Appointment as Exclusive Distributor.** Subject to the terms and conditions of this Agreement, the Ducorsky Group appoints the Distributor as its exclusive distributor of the Products (defined below). The Distributor accepts such appointment and will maintain competency and proficiency with the Products. For purposes of this Agreement, "**Products**" shall mean Packaging Products and Parts; and "**Packaging Products**" shall mean (i) all products acquired or imported from HD China and (ii) and all packaging machinery and/or packaging related machinery and/or change parts manufactured, purchased or imported by any member of the Ducorsky Group as well as any affiliate of any member of the Ducorsky Group except for candy wrapping equipment; and "**Parts**" shall mean (i) all parts acquired or imported from HD China and (ii) and all parts related to packaging or packaging related machinery that are manufactured, purchased or imported by any member of the Ducorsky Group as well as any affiliate of any member of the Ducorsky Group.

2. **Responsibilities:**

    2.1 **Responsibilities of the Ducorsky Group:**

    2.1.1 **Products and Parts:** The Ducorsky Group will provide the Distributor with Products as requested by Distributor to include all Products currently sold by the Ducorsky Group and to be expanded upon request, with such requests not to be unreasonably denied. In connection with the prior sentence, at the request of Distributor, the Ducorsky Group will order Products and Parts, arrange freight and use reasonable efforts to keep the product line competitive, including but not limited to using commercially reasonable efforts to identify alternative suppliers and sources for Products that are less expensive, better quality Products, next generation Products or otherwise competitive with the current suppliers of the Products. The Ducorsky Group and Distributor may decide that for the sake of efficiency, some Products shall be ordered directly from HD China (or any other manufacturer) by Distributor. If Distributor orders directly then the Ducorsky Group will be electronically copied on any and all transactions of this type.

    2.1.2 **Financial Reports and Audits:** The Ducorsky Group will submit, on a confidential basis, to Distributor complete and accurate schedules and reports in and on such electronic forms mutually agreed to by the parties and at such times as Distributor may reasonably request that reflect the sales and associated costs in connection with the purchase and sale of the Products; and permit Distributor, on a confidential basis, to inspect the Ducorsky Group's books and records relating to payments and credits by the Ducorsky Group to HD China, as well as payments from distributors and customers to the Ducorsky Group.

    2.1.3 **HD China Agreement**: The Ducorsky Group will make available to Distributor all benefits contained in the HD China Agreement including all

referrals, support, product training information, product information, customer evaluations and customer service. High Dream Texas shall elect to renew the HD China Agreement at the expiration of its initial term (or any subsequent term) if requested by Distributor. High Dream Texas shall not amend, terminate or assign the HD China Agreement without the written approval of Distributor which will not be unduly withheld.

2.1.4 **The Ducorsky Group Sales Exceptions**: The Ducorsky Group will not sell Products other than to Distributor, or seek or transact business with any other distributors or OEMs for the Products other than with the prior written approval of Distributor; provided that Distributor and the Ducorsky Group will agree in writing on certain OEMs and Distributors that High Dream will manage, subject to the terms of this Agreement. Additions to all groups will not be unreasonably withheld by either Party.

2.1.5 **Sale of Ducorsky Group or Distributor**: In the event of a sale of substantially all of the assets or a majority of the stock of any of High Dream Texas, or the Distributor during the term of this Agreement (including a merger), such selling entity will cause the purchaser to assume the obligations of such selling entity under this Agreement. If the purchaser is a direct competitor of the non-selling entity and such sale (and corresponding inclusion of the purchaser as a party to this Agreement) would in the good faith opinion of the board of directors (or equivalent) of the non-selling entity have a material adverse effect on the non-selling entity, then the non-selling entity shall have the right to terminate this Agreement immediately prior to the consummation of such sale; provided that if the selling entity disagrees with the non-selling entity's conclusion that such sale would have a material adverse effect on the non-selling entity, the parties agree to choose a neutral mediator within 5 business days of such disagreement to determine whether such sale is reasonably likely to have a material adverse effect on such non-selling entity, and if such mediator concludes that such sale would not have such a material adverse effect, then the selling entity may assign this agreement to the purchaser in connection with such sale.

2.2 **Responsibilities of the Distributor:**

2.2.1 **Dedication and Availability of Resources**: The Distributor will dedicate and commit to utilizing commercially reasonable efforts in good faith to achieving the best sales results, net profits and market penetration for Products in the Territory (United States and Canada) is reasonably possible and maintain access to sufficient capital and other resources so as to enable the Distributor to fulfill its obligations hereunder. In order to handle the additional volume of the sale of the new products Ohlson will add as necessary to its service, sales and engineering departments. Ohlson and the

Ducorsky Group intend to rent industrial space in California and negotiate how the rent, expenses and profits will be split and allocated. .

2.2.2 **Financial Reports and Audits:** The Distributor will submit in an electronic format, on a confidential basis, to the Ducorsky Group complete and accurate schedules and reports in and on such forms mutually agreed upon by the parties and at such times as the Ducorsky Group may reasonably request that reflect the sales and associated costs in connection with the purchase and sale of the Products; and permit the Ducorsky Group, on a confidential basis, to inspect the Distributor's books and records relating to payments and credits to Distributor from customers and distributors, and installation and service staff costs and any other items related to the sale of the Products.

2.2.3 **Compliance with HD China Agreement**: Distributor will not sell the Products that are supplied by HD China outside of the United States and Canada without approval from HD China; provided that upon the request of Distributor, High Dream Texas will petition HD China for such distribution rights. It is understood that any sales to entities outside of the United States and Canada will follow all of the guidelines of this agreement (unless otherwise agreed upon in writing by the Ducorsky Group and Ohlson Packaging).

2.2.4 **Service of Products**: Distributor will be responsible for servicing the Products in a commercially reasonable manner comparable to the service provided by other reputable distributors in the same classes of trade and shall pay for such servicing costs subject to the terms of this Agreement. In the event that Distributor does not cover this in a commercially reasonable manner, the Ducorsky Group may assume this responsibility of servicing the Products in a commercially reasonable manner, and High Dream Texas will be reimbursed for the costs of this out of distributions, or in the event that profits are generated from the performance of these duties all will be retained by High Dream Texas. If there is any dispute as to whether either party is servicing the Products in a commercially reasonable manner, the parties agree to choose a neutral mediator within 5 business days of such disagreement to resolve this disagreement.

2.2.5 **Sales Strategy and Costs**: Distributor will be responsible for selecting, developing and managing the sales strategy for the Products, and in connection therewith, shall also be responsible for sales and associated sales and marketing costs such as advertising costs, the costs of trade shows, website optimization services, marketing materials, direct marketing personnel and sales commissions payable to distributors and sales personnel engaged by Distributor. The Ducorsky Group will be invited and allowed to review and comment and valid ideas submitted by

the Ducorsky Group will not be unreasonably rejected. Distributor will exhibit once a year at either the Chicago or the Las Vegas PMMI show (provided these shows are still available), maintain a direct marketing staff, and utilize a website optimization service unless otherwise agreed in writing by Distributor and the Ducorsky Group.

2.2.6 **Administration of Warranty Claims**: Distributor will administer any applicable warranty claims offered in connection with the sale of the Products made pursuant to this Agreement. Distributor will cover all costs related to the freight of warranty parts, subject to the provisions hereunder.

2.2.7 **Minimum Annual Sales Amount**:. Provided that the Packaging Products maintain their current competitive advantage, Distributor, will sell a minimum of Two Million US Dollars ($2,000,000.00) of the Packaging Products annually at average selling prices that are a minimum of three (3) times the cost of the Packaging Products. The annual sales amount of Packaging Products sold is to be calculated using the selling prices (not the costs) of the Packaging Products. The annual sales amount will include sales generated directly by the Distributor to end users of the Packaging Products as well as sales generated by the agents, brokers and other sales channels utilized by the Distributor for the sale of the Packaging Products. The Minimum Annual Sales Amount will be adjusted annually for US CPI as stated by the US Department of Labor Bureau of Labor Statistics.

2.3 **Non-Circumvention and Non-Competition**: Ducorsky and the Ducorsky Group agrees that neither such person or entities, nor any affiliate of such person or entities, will establish, join or invest in any entity that manufacturers, imports or sells Products unless Distributor is made the exclusive distributor for such products in accordance with the provisions of this Agreement, or otherwise without the written consent of Distributor, except for investments in publicly traded entities in which such member owns less than 1% of the equity interests. For the purposes of clarity, it is the agreement that Distributor serve as the exclusive distributor of the Products for the Ducorsky Group as more fully set forth in this Agreement, and that all opportunities to distribute Products will be brought to Distributor's attention during the term of this Agreement. Each of Ohlson and Distributor agrees that neither such person or entity nor any affiliate of such person or entity will establish, join or invest in any entity whose actions circumvent the obligations and agreements of Distributor under this Agreement, except for investments in publicly traded entities in which such member owns less than 1% of the equity interests. For the purposes of clarity, it is the agreement that neither Distributor, Ohlson nor any of their affiliates directly engage HD China other suppliers for the procurement of Products except for those manufactured by Ohlson or Distributor or otherwise agreed to in writing between Distributer and

the Ducorsky Group, other than as specifically permitted by the terms of this Agreement.

    2.4    **Confidentiality**: The parties to this Agreement agree to the provisions of this Section 2.4 in order to protect certain Confidential Information of each other. The party that discloses information to the other party is referred to as "**Disclosing Party**", and the party that receives such information is referred to as "**Recipient**". A party also includes any employees, officers, directors and affiliates, or limited partners or members of such party. "**Confidential Information**" shall mean any information relating to the business affairs of a party to this Agreement, that is secret in the sense that it is not, as a body or in the precise configuration and assembly of its components, generally known among or readily accessible to persons within the industries that normally deal with the kind of information in question; that has value (whether actual or potential) that derives from its being generally not known to or readily ascertainable by proper means by other persons who can or may obtain economic value or advantage over others from its disclosure or use; and has been subject to reasonable steps to keep it secret. Information shall be treated as secret regardless of whether such information is specifically designated as confidential and regardless of whether such information is in written, oral, electronic, or other form. Confidential Information shall not be disclosed by Recipient to any third party and Recipient shall only make internal use of the Confidential Information and then only for the furtherance of the purposes of this Agreement. The obligation of the parties to protect the Confidential Information, shall expire three (3) years following the termination of this Agreement. Recipient shall protect the disclosed Confidential Information by using commercially reasonable standards of care, to prevent the unauthorized use, dissemination, or publication of the Confidential Information. These minimally include the same degree of care as Recipient uses to protect its own proprietary information and assets. Confidential Information shall not include information that; (a) was in Recipient's possession before receipt from Disclosing Party as evidenced by written records; (b) is or becomes a matter of public knowledge through no fault of the Recipient; (c) becomes available to Recipient from a third party without a duty of confidentiality to Disclosing Party; (d) is independently developed by Recipient without use of the Confidential Information; (e) is necessary to be disclosed in a judicial or administrative process; or (f) was obtained unlawfully.

3.    **Terms of Sale:**

    3.1    **Distributor Cost:** The Products which the Ducorsky Group supplies to the Distributor shall be sold to the Distributor at the price paid by the Ducorsky Group for such Products plus freight and other related costs to HD China or such other third party manufacturer ("**Wholesale Price**"). The Wholesale Price shall be net of any commissions or payments made to any member of the Ducorsky Group by any suppliers or other third parties as a result of these purchases. Payment shall be made

promptly. The payments will be generated within the terms required by the specific suppliers, and in most case will require a deposit with the order in for the processing of the order to begin and the balance of payment prior to the shipment of the products.

3.2 **General Allocation of Proceeds for Packaging Products**: Except as otherwise provided herein, the sales proceeds in respect of each Packaging Product sold will be allocated as follows:

3.2.1 33% of gross sales proceeds shall be distributed to Distributor; from this amount, Distributor shall be responsible for paying any distributors or sales personal engaged by Distributor for the sale of such item; provided that this percentage will apply to items that have a minimum markup of 3 times the cost of the product, in the event that the markup is less than this amount the Parties will agree in good faith on the initial percentage paid to Distributor);

3.2.2 the costs of the Product being sold, related freight and any associated taxes, duties or other related costs shall be borne from the balance;

3.2.3 each of Distributor and the applicable member of the Ducorsky Group shall receive 50% of any remaining balance after giving effect to the payments made from 3.2.1 and 3.2.2.

3.2.4 The percentages in Sections 3.2.1 to 3.2.3 will apply to items that have a minimum markup of 3 times the cost of the product, in the event that the markup is less than this amount, the Parties will agree in good faith on the applicable percentages.

3.3 **Allocation of Proceeds for Parts**: It is the intent of the parties that the proceeds for the sale of Parts will be used by the Distributor to cover the costs of servicing the Products. Distributor will report to the Ducorsky Group in an electronic format on an annual basis the annual sales and expenses for the Parts and service department of Distributor, and to the extent of any related annual net profits (revenues minus costs), such net profits will be split evenly between the Distributor and the Ducorsky Group, unless otherwise agreed upon in writing. Any net loss in a particular year will be carried forward to subsequent years and credited to the Distributor.

3.4 **Allocation of Proceeds for the Ducorsky Group Authorized Sales**: Proceeds from sales authorized pursuant to 2.1.4 (The Ducorsky Group Sales Exceptions) to be made by a member of the Ducorsky Group will be allocated as follows:

3.4.1 20% of gross sales proceeds (subject to adjustment as provided in Section 3.4.5) shall be distributed to the applicable member of the Ducorsky Group; from this amount, the Ducorsky Group shall be responsible for paying any

        distributors or sales personal engaged by the Ducorsky Group for the sale of such item;

    3.4.2    13% of gross sales proceeds (subject to adjustment as provided in Section 3.4.5) shall be distributed to Distributor

    3.4.3    the Wholesale Price of the Product being sold, related freight and any associated taxes, duties or other related costs shall be borne from the balance;

    3.4.4    each of Distributor and the applicable member of the Ducorsky Group shall receive 50% of any remaining balance after giving effect to the payments made from 3.4.1, 3.4.2 and 3.4.3.

    3.4.5    The percentages in Sections 3.4.1 and 3.4.2 will apply to items that have a minimum markup of 3 times the cost of the product, in the event that the markup is less than this amount, the Parties will agree in good faith on the applicable percentages;

4. **Required Payments to HD China:**

    4.1    **Maintenance of Exclusivity:** It is the objective of the Distributor and the Ducorsky Group that High Dream Texas meets the Minimum Purchase Quotas in the HD China Agreement. In the event that the Distributor and the Ducorsky Group fail to meet the Minimum Purchase Quotas in the HD China Agreement, the Ducorsky Group shall attempt to renegotiate the amounts due in order to maintain the exclusive arrangement and if such negotiations prove unsuccessful, the Ducorsky Group shall use reasonable efforts to replace the HD China Agreement with a new agreement that the Distributor and the Ducorsky Group mutually agree upon.

5. **Indemnification:**

    5.1    **Indemnification by Distributor:** In express recognition that the Distributor, not the Ducorsky Group, is responsible for the selection, training and qualification of the persons or companies to whom the Distributor elects to sell and the imparting of directions and instructions to installers and end-users who may purchase Products from the Distributor, the Distributor agrees to indemnify, defend and hold harmless the Ducorsky Group from and against all causes of action and claims ("**Claims**") by third parties for damages and losses arising from the acts or omissions of Distributor, EXCEPT for (a) Claims for personal injury, including death or property damages, caused by manufacturing or design defects in Products or components thereof furnished by the Ducorsky Group; (b) Claims under a written warranty provided by the Ducorsky Group, HD China or any other third party supplier; and (c) Claims made according to the terms of a written agreement between the Ducorsky Group and claimant; provided, however, that the Ducorsky Group (1)

gives Distributor prompt notice of the Claim; (2) cooperates fully by providing information, technical assistance, and personnel necessary to properly defend against the Claim; and (3) if it acknowledges to the Ducorsky Group its liability in advance, then Distributor has the right to control the defense or settlement of the Claim and select counsel to act on its behalf.

5.2 **Product Liability Indemnification:** The Ducorsky Group agrees to indemnify, defend and hold harmless the Distributor from and against all Claims by unrelated third parties for damages and losses, sounding in tort or strict liability but not in contract, for personal injury (including death) or property damage to the extent caused by a defect in design, material, or workmanship of goods or services sold to Distributor by High Dream Texas or HD China or any other third party supplier to High Dream Texas under this Agreement; provided, however, that (a) Distributor demonstrates that no action or inaction of Distributor caused or contributed to the damages or losses claimed; (b) Distributor gives the Ducorsky Group prompt written notice of the Claim; (c) Distributor cooperates fully by providing information, technical assistance, and personnel necessary to properly defend against the Claim; and (d) the Ducorsky Group has the right to control the defense or settlement of the Claim and to select counsel to act on its behalf.

6. IN NO EVENT SHALL THE DUCORSKY GROUP OR DISTRIBUTOR BE LIABLE FOR ANY SPECIAL, INCIDENTAL, OR CONSEQUENTIAL DAMAGES OR LOSSES OF ANY KIND WHATSOEVER, WHETHER IN STATUTE, CONTRACT, TORT (INCLUDING NEGLIGENCE), WARRANTY, OR STRICT LIABILITY.

7. **Trademarks:** Distributor is and shall be entitled to use and to authorize others to use and affix Distributor's trademark(s) and trade names to the Products so long as it does not violate any agreement with or from the manufacturer of the Product.

8. **Term and Termination:**

    8.1 **Term:** This Agreement shall be 10 years, and will automatically renew for an additional 10 year term unless earlier terminated as provided below.

    8.2 **Termination by Distributor.** The Distributor may terminate this Agreement if the Ducorsky Group commits a Ducorsky Group Material Breach of its obligations hereunder. If termination by Distributor was due to a Ducorsky Group Material Breach, then the Ducorsky Group's (and their affiliates') obligations under Section 2.3 (Non-Circumvention) shall survive termination for a period of 5 years and Ohlson and the Distributor (and their affilitates') shall be relieved of such Section 2.3. For purposes of this Agreement, a "**Ducorsky Group Material Breach**" shall mean the continuance of any of the following items, in each case after notice and a reasonable opportunity to cure such breach: (A) failure of the Ducorsky Group to use reasonable effort in order to import Products that are available to be imported and requested by Distributor, (B) failure of the Ducorsky Group to use reasonable

efforts to keep the product line competitive or (C) violation by the Ducorsky Group of 2.3 (Non-Circumvention) or Section 1.

    8.3    **Termination by the Ducorsky Group**. The Ducorsky Group may terminate this Agreement if Distributor commits a Distributor Material Breach of its obligations hereunder, in which case Ohlson and the Distributor's (and their affiliates') obligations under Section 2.3(Non-Circumvention) shall survive termination for a period of 5 years and the Ducorsky Group shall be relieved of its obligations under said Section 2.3. For purposes of this Agreement, a "**Distributor Material Breach**" shall mean the continuance of any of the following items, in each case after notice and a reasonable opportunity to cure such breach: (A) violation by Ohlson or the Distributor of 2.3 (Non-Circumvention) or (B) failure to make a reasonable effort to (i) meet its sales quota, (ii) market the Products, (iii) sell the Products or (iv) service the Products,(v) nonpayment of amounts due based upon article 3.2 and/or 3.4 (vi) Failure to meet the minimum sales amount in Section 2.2.7.

    8.4    **Impact of Termination or Non-Renewal:** Neither party shall have any liability whatsoever to the other as a result of exercising a right to terminate this Agreement, except as expressly provided herein. In addition to the provisions above, the obligations of the parties under 2.4 (Confidentiality) shall survive termination.

9.    **Miscellaneous:**

    9.1    **No Waiver by Omission:** The parties shall not be deemed to have waived any of their rights hereunder unless such waiver be in writing and signed. No delay or omission in exercising any right shall operate as a waiver of such right or any other rights. A waiver on any one occasion shall not be construed as a bar to or waiver of any right or remedy on any future occasion.

    9.2    **No Waiver by Lack of Demand to Perform:** The failure at any time to require performance of any provision herein shall in no way affect the right to require such performance at any time thereafter.

    9.3    **Invalid Provisions:** Should any part of this Agreement for any reason be declared invalid, unenforceable, or inoperative, such declaration shall not affect the validity of any remaining portion, and such remaining portion shall remain in force and effect as if this Agreement had been executed with the invalid portion eliminated and the Agreement will be deemed to be amended so as to be enforceable up to but not beyond the limits allowed by law.

    9.4    **Governing Law:** This Agreement shall be construed, governed, and controlled by the laws of the Commonwealth of Massachusetts, excluding its conflict of laws provisions.

9.5 **Notices:** All notices to any member of the Ducorsky Group shall be sent to the attention of Brad Ducorsky, by registered or certified mail or by a nationally recognized courier service such as Airborne or Federal Express, or any other means if actually received, to the address shown at the beginning of this Agreement, or to such other address as Brad Ducorsky shall designate in writing. All notices to the Distributor shall be sent by registered or certified mail or by a nationally recognized courier service, such as Airborne or Federal Express, or any other means if actually received, to the address shown at the beginning of this Agreement, or to such other address as the Distributor shall designate in writing.

9.6 **No Agency:** The Ducorsky Group and the Distributor, under the terms of this Agreement, are not and shall not hold themselves out to be and shall not be considered as an agent, legal representative, joint venturer, or partner of the other for any purpose whatsoever.

9.7 **Entire Agreement and Prior Agreements Canceled:** The parties agree that upon execution of this Agreement by the parties, all previous Agreements relative to this distributorship are canceled and no previous course of dealing not specifically set forth in this Agreement shall be admissible to explain, modify, or contradict this Agreement. This Agreement constitutes the entire agreement between the parties with respect to their distribution relationship.

9.8 **Amendment and Waiver:** This Agreement may not be altered or amended, nor any of its provisions waived, without the consent of the Distributor and any member of the Ducorsky Group.

9.9 **Paragraph Headings:** Paragraph headings used in this Agreement are for reference purposes only and shall not offset in any way the meaning or interpretation of this Agreement.

9.10 **Effective Date:** This Agreement shall only become binding, enforceable, and effective upon the date first above written.

9.11 **Counterparts:** This Agreement may be executed on one or more counterparts.

[Signature Page to Follow]

*]*

IN WITNESS WHEREOF, the duly authorized representatives of the parties have executed this Agreement.

WITNESS:

*[signature]*

**DISTRIBUTOR:**
CP PACKAGING INC. D/B/A OHLSON PACKAGING INC.

By: *[signature]*
John Ohlson, Jr., President

MARK S. Tucker

**HIGH DREAM MACHINERY LLC**

By: *[signature]*
Brad Ducorsky, President

WITH RESPECT TO SECTION 2.1.5 (NON-CIRCUMVENTION) AND SECTION 8 (TERM AND TERMINATION) ONLY:

*[signature]*
John Ohlson, Jr.

*[signature]*
Brad Ducorsky

]

# EXHIBIT A

## HD CHINA AGREEMENT

[Attached]